# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE

In re

SHARON DENISE BOONE

Case No. 3:18-bk-30150-SHB
Chapter 7

Debtor

## MEMORANDUM ON
## MOTION TO COMPROMISE DISPUTE

**APPEARANCES:**   QUIST, FITZPATRICK & JARRARD
　　Ryan E. Jarrard, Esq.
　　2121 First Tennessee Plaza
　　800 South Gay Street
　　Knoxville, Tennessee  37929
　　Attorneys for Michael H. Fitzpatrick, Chapter 7 Trustee

　　WILLIAM E. MADDOX, JR., LLC
　　　William E. Maddox, Jr., Esq.
　　　Post Office Box 31287
　　　Knoxville, Tennessee  37930
　　　Attorneys for Debtor

　　F. SCOTT MILLIGAN, ESQ.
　　　Post Office Box 12266
　　　Knoxville, Tennessee  37912
　　　Attorney for Raymond and Doris Davis

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

The contested matter before the Court is the Motion to Compromise Dispute ("Motion") [Doc. 58] filed by Michael H. Fitzpatrick, the Chapter 7 Trustee (the "Trustee"), on May 18, 2018, seeking approval of a compromise and settlement between Debtor's bankruptcy estate and Debtor's former spouse, Clifton Boone, Jr. ("Boone"). Objections were filed by Debtor and creditors Raymond and Doris Davis ("the Davises"), who are also Debtor's parents. [Docs. 60, 61.] The issue to be decided, as defined by the parties [Doc. 67], is whether the Trustee's Motion is reasonable under the circumstances of the case and should be approved over the objections of creditors. Because the Court finds that the Trustee has met his burden and shown that the proposed settlement is fair and equitable and in the best interest of the estate, the Court will grant the Motion and approve the settlement.

The evidentiary hearing of this contested matter was held on August 15, 2018. The record consists of joint stipulations submitted by the parties on August 6, 2018 [Doc. 67]; seven exhibits stipulated into evidence; and the testimony of the Trustee; Boone; William E. House, III; Chester Meeker; Doris Davis; and Debtor. Additionally, pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice of all documents of record in this bankruptcy case. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). This memorandum constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr. 7052, 9014(c).

## I. RELEVANT PROCEDURAL HISTORY & TERMS OF THE PROPOSED SETTLEMENT

Debtor filed this Chapter 7 bankruptcy case on January 23, 2018, at which time the Trustee was appointed and has since continued to act in that capacity. To date, claims totaling $433,881.68 have been asserted against the estate, comprised of $224,287.19 filed as secured, $15,569.04 filed as priority unsecured, and $194,025.45 filed as unsecured non-priority.

1

Prior to filing her bankruptcy case, Debtor and Boone commenced divorce proceedings in the Monroe County Chancery Court (the "State Court"); however, as of the petition date, no final decree or final property division had been entered by the State Court. During the course of the divorce proceedings, the State Court appointed a receiver to manage the Boones' assets, and a hearing on all matters in controversy in the divorce case was scheduled before the State Court on September 4, 2018, but was continued pending resolution of this Motion. Included within the Boones' marital property are several parcels of real property that are either owned jointly as tenants by the entireties or owned solely by Debtor but considered marital property. The three properties in dispute[1] are described as follows:

- A commercial building located at 700 Englewood Road, Madisonville, Tennessee, that is titled to the Boones jointly as tenants by the entireties and houses a laundromat (the "Laundromat"). [Doc. 67 at ¶ 5.] Debtor valued the Laundromat at $380,000.00, and BB&T holds a secured claim against this property in the amount of $148,113.47 that is solely in Debtor's name. [*Id.*] The Trustee, who ultimately concluded that the Laundromat has a market value of $225,000.00, proposes to transfer this property to Boone, who will be responsible for the secured obligation owed to BB&T that will be discharged as to Debtor in her bankruptcy case.

- A commercial building located at 827/866 Old Englewood Road, Madisonville, Tennessee, that is titled solely to Debtor and consists of approximately 4.76 acres and an unfinished garage-type building (the "Garage Property"). [Doc. 67 at ¶ 6.] Debtor valued the Garage Property at $220,000.00, and BB&T has a secured claim against this property

---

[1] The Trustee also proposes to transfer to Boone a 1986 Renault Alliance, a John Deere go-cart, a 2010 aluminum boat, and a Tigershark jet ski, but the value of these assets is not in dispute, and neither Debtor nor the Davises object to the transfer of these assets to Boone. [Doc. 58.]

2

    in the amount of $76,173.72 that is solely in Debtor's name. [*Id.*] The Trustee valued this property at $150,000.00 and proposes to retain it in Debtor's bankruptcy estate to be sold for the benefit of creditors. After paying the BB&T debt, such a sale would result in the bankruptcy estate recovering $73,826.28 related to the sale of the Garage Property.

- A residential lot known as Lot 8, Old Citico Road, Vonore, Tennessee, that is titled to the Boones jointly as tenants by the entireties (the "Residential Lot"). [Doc. 67 at ¶ 7.] Debtor valued the Residential Lot, which is not encumbered, at $44,500.00. [*Id.*] The Trustee proposes to retain this property in Debtor's bankruptcy estate to be sold for the benefit of creditors. At the evidentiary hearing, the Trustee stated that he believed the Residential Lot would sell for approximately $20,000.00 to $25,000.00.

[*See also* Doc. 58.] The proposed settlement also incorporates $20,692.70 that was on deposit in bank accounts for the Laundromat and Debtor as of the trial date, which funds will remain in the bankruptcy estate to be paid to creditors pro rata after payment of Debtor's exemptions. [Doc. 58.] The Trustee clarified at trial that the bank account funds fluctuate based on net income from the Laundromat.

    In support of the settlement, the Trustee explained that only the Garage Property is owned in fee simple because the other properties are owned as tenants by the entireties so that the estate holds only a survivorship interest in those entireties properties. Further, because the 180-day period in § 541(a)(5)(B) has passed, the estate is only guaranteed Debtor's survivorship interest even if the State Court were to award the entireties properties to Debtor as part of a property distribution. He also argued that there could be a lengthy and costly trial in the State Court to determine values and an equitable division of the properties, which litigation might result in a much smaller net recovery for the bankruptcy estate for distribution to creditors.

Ultimately, the Trustee asserted that the settlement is fair and equitable because Boone is forfeiting his interest in all other marital property, including unencumbered real property as well as a sizeable sum of cash being held in the Laundromat's bank accounts, and is taking the Laundromat subject to a secured obligation owed to BB&T that is not currently being serviced. Finally, the Trustee argued that the settlement should be approved because the Davises, who are Debtor's parents and insiders, are attempting to end-run the bankruptcy court to the detriment of all other creditors by seeking stay relief to ask the State Court to divide the property and adjudicate debt allegedly owed to them by Debtor relating to funds they gave to Debtor for improvements of some of the properties. The Trustee asserted that allowing the Davises to pursue their position in the State Court could result in their unsecured claim being favored over other creditors.[2]

Debtor[3] and the Davises, who filed unsecured claims in the aggregate amount of $113,934.30,[4] oppose the settlement, arguing (1) that it does not divide the property fairly because the other properties do not provide the estate with a fair equivalent to the Laundromat

---

[2] The Davises filed an intervening petition in the State Court against Boone and Debtor. [Doc. 69-5.] Debtor defaulted, resulting in an order taking as true the Davises' allegations against Debtor. [*Id.* at p.1 ¶ 2.] Boone, however, answered, and the State Court found after trial tat the statute of frauds bars the Davises' claim against Boone for any debt of the Davises or Debtor to the Davises. [*See id.* at p. 2 ¶ 1.] The State Court held that the only potential liability of Boone to the Davises relates to "any payment of debt [that] Mr. Boone agreed to regarding washing machines paid for by the Davises." [*Id.* at p. 2 ¶ 2.]

[3] Debtor argues that because she owes income taxes for 2017 in the amount of $12,000.00 that will be paid by the Trustee with available funds, she has standing to object to the compromise because she has a pecuniary interest in the outcome of the settlement. Debtor also argues that under a distribution by the State Court, funds will flow back to her after all creditors have been paid. The Trustee did not object to Debtor's standing, and the Court finds that she has standing in this contested matter.

[4] The parties' Stipulations state that Davises' claims (9 through 14) total $108,773.85; however, the aggregate amount of those filed claims is $113,934.30. At trial, the Trustee stated that he has concerns about the documents attached to the Davises' proofs of claim, some of which are not dated or executed, and he questions whether the obligations reflected are valid debts. He testified that he has not yet objected to the Davises' claims because he is waiting to see if he has the resources or a reason to formally object. For the purposes of this contested matter, the Court did not consider the documents attached to the Davises' proofs of claim, nor does the Court make any determination concerning the documentation.

4

being transferred to Boone and (2) that the State Court is the proper jurisdiction to determine the property distribution in the Boones' divorce. Specifically, they argued that because the State Court has wide discretion in how assets are divided pursuant to Tennessee Code Annotated § 36-4-121, the goal of which is to make "a just and equitable division of the marital estate, [which] does not necessarily mean an equal one" [Doc. 68 at 6], the State Court, rather than the Bankruptcy Court, is the proper jurisdiction to determine division of the Boones' property and debts. To that end, Debtor and the Davises filed a Joint Motion for Relief from the Automatic Stay on July 31, 2018, asking the Court to grant stay relief to allow the State Court to adjudicate the Boones' property distribution.[5] They also argued that the value of the property proposed to be transferred to Boone is greater than the value of the property remaining in Debtor's bankruptcy estate because the most valuable asset (i.e., the Laundromat) is being transferred to him.

### III. ANALYSIS

Rule 9019 authorizes approval or disapproval of compromises and settlements in bankruptcy cases. Compromises "'are favored in bankruptcy cases in order to minimize the cost of litigation to the estate and expedite its administration.'" *In re W. Pointe Props., L.P.*, 249 B.R. 273, 282 (Bankr. E.D. Tenn. 2000) (citations omitted). "At the same time, however, it is essential that every important determination in [bankruptcy] proceedings receive the 'informed, independent judgment' of the bankruptcy court." *In re McInerney*, 528 B.R. 684, 687 (Bankr. E.D. Mich. 2014) (quoting *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). Thus, whether to approve a compromise balances on whether it is "both fair and equitable, and in the best interest of the estate." *In re High Tech*

---

[5] The final hearing on the Joint Motion for Relief from the Automatic Stay is scheduled for November 8, 2018.

5

*Packaging, Inc.*, 397 B.R. 369, 671 (Bankr. N.D. Ohio 2008). Moreover, the determination "is within the sound discretion of the bankruptcy judge." *In re W. Pointe Props., L.P.*, 249 B.R. at 282 (citation omitted).

To assess the fairness and equity of the proposed compromise, courts generally weigh the following factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience[,] and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views.

*In re Boddie*, 569 B.R. 297, 302 (Bankr. S.D. Ohio 2017) (quoting *Fishell v. Soltow (In re Fishell)*, 47 F.3d 1168, 1995 WL 66622 at *3 (6th Cir. Feb. 16, 1995)). "'[W]hen assessing a compromise, courts need not rule upon disputed facts and questions of law, but only canvass the issue[s].'" *Suter v. Goedert*, 396 B.R. 535, 548 (D. Nev. 2008) (quoting *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997)). "In evaluating a Rule 9019 settlement, a bankruptcy court need not 'conduct a mini-trial to determine the probable outcome of any claims waived in the settlement.' Rather, the bankruptcy court must 'apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision.'" *Official Comm. of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*, 801 F.3d 530, 541 (5th Cir. 2015) (quoting *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997)); *see also In re Boddie*, 569 B.R. at 303 ("The responsibility of the bankruptcy court 'is not to decide the numerous questions of law and fact raised by [the objecting party] but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness[.]'" (citation omitted); *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014) ("The Court 'need not be convinced that the settlement is the best possible compromise. The Court need only conclude that the

6

settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness.'" (citation omitted)).

The Trustee, as the party proposing the settlement, "bears the burden of persuading the bankruptcy court that the compromise should be approved." *In re Boddie*, 569 B.R. at 303; *see also In re High Tech Packaging*, 397 B.R. at 372 ("The trustee has the burden to establish that a motion to compromise is appropriate with respect to these considerations.").

> The court is not permitted to act as a mere rubber stamp or to rely on the Trustee's word that the compromise is reasonable. Rather, the court possesses "an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." At the same time, the judgment of the trustee deserves some deference.

*In re West Pointe Props., L.P.*, 249 B.R. at 281 (quoting *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988)). As previously stated, based on the proof established at the evidentiary hearing, the Court finds that the factors weigh in favor of approving the settlement.

**A. Probability of Success in State Court**

Because the circumstances here make for an unpredictable outcome in the State Court, none of the parties offered any sort of proof concerning the probability of success there. Instead, other than pointing to the obvious uncertainty in the State Court, the Trustee focused his argument on the third factor (concerning costs, delay, and convenience), and Debtor and the Davises concentrated their arguments on whether the State Court was a more appropriate venue than this Court to make any determinations concerning division of the Boones' property. These arguments will be discussed in detail in subsection C. The Court finds that this factor weighs neither in favor of nor against approving or disapproving the settlement.

**B. Difficulties with Collection**

The parties do not dispute that the Boones own the Laundromat and Residential Lot as tenants by the entireties, which "is a property interest reserved solely for married persons wherein 'each spouse is seized of the whole or the entirety and not a share, moiety, or divisible part' and ownership of the property, as a whole, fully vests in the surviving spouse upon the death of the other spouse.'" *In re Roos*, ___ B.R. ___, No. 3:17-bk-33815-SHB, 2018 WL 4471013, at *3 (Bankr. E.D. Tenn. Sept. 14, 2018) (citations omitted). When one spouse files for bankruptcy and the other spouse does not, the only property interests that enter the filing spouse's bankruptcy estate with respect to that property are a possessory interest and a survivorship interest, but only the survivorship interest remains in the bankruptcy estate after application of exemptions. *See Weir v. Chadwick (In re Chadwick)*, Adv. No. 09-1183, 2011 WL 477858, at *6 (Bankr. E.D. Tenn. Feb. 7, 2011) ("Once the entirety interest is included in the estate, section 522(b)(2)(B) allows the debtor to exempt the possessory interest because the present possessory interest is exempt from process under Tennessee law. The survivorship interest remains in the estate subject to administration for the benefit of creditors." (citations omitted)).

Also relevant here is 11 U.S.C. § 541(a)(5)(B), which provides that a debtor's bankruptcy estate includes any interest in property "that the debtor acquires or becomes entitled to acquire within 180 days after [the petition date] as a result of a property settlement with the debtor's spouse." Indisputably, the 180 days referenced in § 541(a)(5)(B) expired here on July 22, 2018. Because Debtor did not become entitled to a specific property settlement from the State Court before that date, the only interest that is included within her bankruptcy estate for any property owned with Boone as tenants by the entireties is Debtor's survivorship interest. At trial, the

8

Trustee testified no profitable market exists for the sale of survivorship interests and that the most the estate could reasonably expect to receive would be $2,000.00 for the Laundromat and $500.00 for the Residential Lot. Debtor and the Davises did not dispute this testimony.

The Trustee testified without contradiction that he attempted to resolve the property issues before expiration of the 180-day period but that, in his experience, property settlements rarely are resolved within 180 days. He testified that the bankruptcy filing stayed a contempt action in the State Court that was scheduled for six days after the petition date and that a trial had been scheduled in the State Court for March 2018 (i.e., within 180 days of the petition date). The trial, however, was continued after the Davises attempted to intervene in the case and because of the poor health of Boone's divorce attorney. The Trustee also testified that he had not been opposed to the Boones' property division being determined by the State Court in March 2018 because it fell within § 541(a)(5)(B)'s 180-day period such that all of Debtor's interests awarded by the State Court would have become property of the bankruptcy estate. Additionally, the Trustee testified that he had attempted to settle with Boone when the trial was continued but Boone could not obtain a loan for the $23,500.00 that the Trustee would have required Boone to pay as part of the settlement.

Debtor and the Davises did not offer any proof concerning collection issues; rather, they asserted that if the Court were to disapprove the settlement and allow the State Court to adjudicate the property settlement, Debtor would waive the provisions of § 541(a)(5)(B) and agree to an extension of the 180 days to allow all property interests awarded by the State Court to be included within her bankruptcy estate. When questioned about his approval of such a waiver, the Trustee noted that the issue had not been discussed before trial so that he did not know if Debtor, in fact, could waive that provision of the Bankruptcy Code in a Chapter 7. He also

9

questioned whether he had the authority to agree to such an arrangement given that the time had already expired without extension.

Debtor's and the Davises' counsel were unable to cite to any authority that could allow either a waiver or an extension of the 180-day period of § 541(a)(5)(B) in Chapter 7. Likewise, the Court could find only cases that allowed an extension of the 180 days in Chapter 13 cases – solely based on the interplay between § 541(a)(5) and 11 U.S.C. § 1306(a)(1) ("Property of the estate includes, in addition to the property specified in section 541 of this title – all property of the kind specified in such section that debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first[.]"). *See, e.g., In re Sizemore*, No. 09-61064, 2013 WL 6328260, at *2 (Bankr. E.D. Ky. Dec. 5, 2013) ("Numerous courts have held that § 1306 expands the 180-day time period in § 541(a)(5)(C) to classify an inheritance or other 'windfall' received more than 180 days after commencement of the case." (citing *Boddie v. PNC Bank, NA*, No. 2:12-cv-18, 2013 WL 443773 (S.D. Ohio Feb. 5, 2013); *United States v. Harchar*, 371 B.R. 254 (N.D. Ohio 2007); *In re Wetzel*, 381 B.R. 247, 253, 54 (Bankr. E.D. Wis. 2008))). Additionally, at least under the circumstances here, the Federal Rules of Bankruptcy Procedure do not authorize an extension of the 180-day period provided by § 541(a)(5)(B).[6]

Based on the expired time limitation of 11 U.S.C. § 541(a)(5)(B), the Court finds that this factor weighs heavily in favor of approving the settlement.

---

[6] Rule 9006(b) authorizes enlargement of time: "[W]hen an act is required or allowed to be done at or within a specified period *by these rules or by a notice given hereunder or by order of court*, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect" (emphasis added). The 180-day period is not set by any rule but by § 541(a)(5)(B). Further, even if Rule 9006(b) applied, the period expired on July 22, 2018, and no party has raised any facts that would appear to constitute excusable neglect for failure to seek an enlargement before the period expired.

**C. Complexity, Expense, Convenience, and Delay**

Even if § 541(a)(5)(B) did not apply to preclude the bankruptcy estate from benefitting from property distribution by the State Court, the Trustee also testified without refutation that the estate likely would be substantially diminished by allowing the State Court to divide the marital property. Debtor and Boone have been engaged in a very contentious divorce for more than two years – a fact that was corroborated by Debtor's and Boone's testimony. A trial before the State Court would likely be highly contentious, and there is no indication how long it would take for the State Court to schedule and conduct a trial or render an opinion. Moreover, valuation of the marital property by the State Court would require appraisals (with related fees) and would result in additional attorneys' fees that would not enhance the value of the properties at issue but would reduce the net value of any property allotted to Debtor, which in turn would decrease the distribution to unsecured creditors.

Debtor and the Davises failed to address this factor or the considerations concerning a trial by the State Court. Instead, they argued that the State Court possesses the power to appropriately divide the marital property and that a property division by the State Court would be more equitable than the settlement proposed by the Trustee. Unquestionably, this Court agrees with Debtor and the Davises that the State Court is well-versed in divorce cases involving property settlements and is an appropriate venue to assess, value, and order distribution of the Boones' assets and liabilities. In fact, had Debtor not filed for bankruptcy, the State Court would have been the only appropriate jurisdiction for doing so. However, once Debtor filed her Chapter 7 petition, jurisdiction over her property interests, as part of her bankruptcy estate, fell under the jurisdiction of this Court, and this Court is in the better position to first determine what is and is not property of Debtor's bankruptcy estate and then to apportion those property interests

11

within the scope of the Bankruptcy Code, focusing on the best interests of creditors rather than on whether the division of the property between Debtor and Boone is equitable.

Based on the proof (and setting aside the impact of § 541(a)(5)(B)), the Court agrees with the Trustee that disapproval of the settlement to allow the State Court to determine the division of property would result in increased costs, diminished funds available to creditors, and an unnecessary delay; thus, this factor weighs in favor of approving the settlement. That is, litigation before the State Court unquestionably would result in the Trustee (as well as other parties) incurring appraisal costs and additional attorneys' fees for trial preparation and trial (as well as any subsequent appeals if any party is dissatisfied), thus decreasing the net amount available for distribution to creditors, no matter the outcome of the State Court litigation. Furthermore, because a trial is necessary in State Court, additional delay would result before the issues could be adjudicated there, and that delay could well be lengthened by appeal of the State Court's decision.

**D. Interests of the Creditors**

The Trustee serves as the representative of Debtor's bankruptcy estate and is charged by the Bankruptcy Code with administering the estate "as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1); *see also* 11 U.S.C. § 323(a). At trial, the Trustee testified that his interests with respect to division of the marital property are broad because he is attempting to maximize the estate and potential distribution to creditors. The Trustee asserted that, on the other hand, Debtor's and the Davises' interests are narrow because their intent is to maximize payment to the Davises. The Trustee testified that the State Court receiver, in his report and in informal communications with the Trustee, recommended liquidation of all marital assets. In opposition to the settlement, Debtor and the Davises argued

that the Trustee's proposed settlement would result in a windfall to Boone to the detriment of Debtor's creditors.

The starting point for determining whether the settlement proposal is fair and equitable in terms of the respective values of the proposed property division is each property's independent value. The Trustee first looked to the values listed in Debtor's Schedule A and the secured claims filed by BB&T. He also included in the assets to be retained by the estate the cash receipts from the Laundromat operations net of post-petition operating expenses. Finally, the Trustee considered the tax appraisal values as reference points [*see* Exs. 1-3], and he reviewed the deeds for each of the properties, including the sworn statements on each deed that disclosed the consideration transferred for each property. In his opinion, based on his research as well as communications with the receiver and a real estate agent on whom the Trustee routinely relies for valuation, the Trustee estimated the fair market values of the Residential Lot at approximately $25,000.00, the Garage Property at $150,000.00, and the Laundromat at $225,000.00.

Debtor and the Davises disagreed with the Trustee's valuation and offered the testimony of William E. House, III (a licensed Tennessee appraiser, broker, and auctioneer) and Chester Meeker (who is in the business of brokering the sale of laundromats) to rebut the Trustee's valuations and prove to the Court the inequities of the property division proposed in the settlement. With respect to the Residential Lot, Mr. House assigned a value of $20,000.00, focusing on the facts that there are many lots for sale in the particular subdivision where the lot is located, that the subdivision is about thirty years old, and that his research showed no sales within that subdivision in more than four years. [Ex. 7.] Mr. House testified that he could hope

to market and sell it in four to six months. He did not have an opinion concerning the entireties interest and was unfamiliar with sales of survivorship interests.

Mr. House valued the Garage Property at $120,000.00, assigning $40,000.00 to the land and $80,000.00 to the building. [Doc. 6.] He testified that the property can be seen from Highway 411 but is not easily accessible and sometimes floods. The building is not in good condition, except that it now has a new roof. For six months before the Boones purchased it in June 2015, Mr. House listed the property at between $75,000.00 and $100,000.00, but the listing expired with no offers. Still, Mr. House testified that he anticipated he could sell the Garage Property within about six months and that he had offered to the Trustee his services to sell the property for the bankruptcy estate.

Finally, Mr. House valued the Laundromat at $280,000.00; however, his valuation was limited to the property and building with no consideration of the business as a going concern. [*See* Ex. 5.] Mr. House looked at comparable sales, but he did not perform an income capitalization valuation. As with the Residential Lot, Mr. House again had no opinion or knowledge concerning the sale of a survivorship interest in the Laundromat.

Debtor and the Davises also relied on the testimony of Chester Meeker concerning valuation of the Laundromat. Mr. Meeker, who has been in the business of setting up laundromats, brokering sales, and selling laundry equipment since 1998, testified that he helped the Boones obtain used equipment for the Laundromat. Also, in November 2017, he brokered on behalf of Debtor an unconsummated sale of all of the laundry equipment for $100,000.00. [Doc. 8.] When that sale failed, Mr. Meeker brokered a second proposal in December 2017 for the sale of the Laundromat for $380,000.00, which price was based solely on the value of the business rather than the property. That proposed purchase price, however, was contingent on Boone

14

agreeing to a non-competition provision. To arrive at the values for the proposals he had brokered, Mr. Meeker testified that he used the industry standards for gross income (i.e., 1 x 2.5% of the actual gross income) and net income (i.e., 1 x 3.5-5.5% of the actual net income). He did not rely on net profits, but he testified that even if none of the equipment works, the Laundromat is still worth $75,000.00 because it is the only laundromat in Madisonville. Mr. Meeker offered to assist the Trustee in selling the Laundromat.

For his part, the Trustee acknowledged the pre-petition offer to purchase the Laundromat for $380,000.00 [*see* Ex. 9], which was reduced to $280,000.00 in June 2018 and later withdrawn because Boone would not agree to a non-compete clause. The Trustee, however, did not agree that the property is actually worth either $380,000.00 or $280,000.00, especially because increasingly fewer of the aging machines are operational and the Laundromat is losing customers. Instead, based on informal information he received from the State-Court receiver and the real estate professional with whom he regularly works, the Trustee believes a reasonable sale price for the Laundromat would be approximately $225,000.00. The Trustee also testified that he knew of no evidence to substantiate Debtor's representations that before the Trustee took over operations in February 2018, the Laundromat's annual income was approximately $90,000.00 (or $7,500.00 per month). He also discounted the values from the proposed sales because the BB&T debt has not been serviced since the petition was filed.

The Trustee also detailed his experiences with the Laundromat since he took over operations, and he introduced into evidence photographs of the property that he took approximately one month before trial. [*See* Trial Ex. 4.] He testified that the building was not built to be a laundromat, but it is clean. Some of the washing machines and dryers are not operational, and those that have been repaired continue to be in need of repair. The vending

15

machines have not been stocked, and only one of the kiddie rides is operational. The coin changer machine was working but had recently broken, and he was hoping to have it repaired as soon as possible. He estimated that the Laundromat's monthly income is approximately $5,305.00, before deduction of approximately $1,500.00 for utilities. As of the date of trial, the Laundromat's operations account contained $20,692.72,[7] from which the Trustee pays monthly electric and gas bills, liability insurance, and expenses for maintenance on the machines. The Trustee does not, however, service the loan obligation to BB&T, which is $2,347.88 monthly, and he has made no representations or warranties to Boone concerning the BB&T loan or what the bank will do once Debtor receives a discharge. The Trustee explained that Boone performs cleanup at the Laundromat, helps the Trustee's staff with collecting money from the machines, services the machines, handles repairs that result from vandalism, and performs other manual labor associated with the Laundromat. Boone corroborated at trial that he performs these tasks.

After consideration of the evidence presented by the parties regarding the value of the Laundromat, the Court finds that the Trustee's $225,000.00 valuation is more reasonable than Mr. Meeker's $280,000.00. In arriving at this assessment, the Court finds most persuasive the Trustee's testimony concerning his operation of the business since February 2018 and his more accurate view of what the entire package – consisting of the real property, the building, and the business – is actually worth. Also important is the fact that the $280,000.00 offer was withdrawn because Boone refused to sign a non-competition agreement. The Court also considered Mr. Meeker's belief, based on his experience in the field, that the Laundromat is worth $75,000.00 simply because it is the only such business in the area, even if all of the machines are inoperable.

---

[7] This amount has accumulated over the six months since the Trustee took control over the Laundromat operations (i.e., from February to August (the evidentiary hearing date in this contested matter)). Thus, the average net monthly income for those six months has been only $3,448.79 (i.e., $20,692.72 divided by 6).

16

Ultimately, the Court agrees with the Trustee that an appropriate valuation must consider all aspects of the property and the business.

Finally, the Court also finds it relevant that none of the post-petition net monthly income of $3,805.00 ($5,305.00 less $1,500.00) is being paid to service the $2,347.88 monthly debt obligation owed to BB&T, which will retain a lien on the Laundromat after the underlying debt is discharged as to Debtor, who is the sole obligor on the debt. Based on this testimony by the Trustee, BB&T is owed approximately $21,130.92 for post-petition debt servicing (computed as $2,347.88 (the monthly payment) multiplied by nine months (since the petition was filed January 23, 2018)). Its secured claim totals $148,113.47 [Claim 2-1], not including interest or late charges. Thus, to own the Laundromat free and clear of BB&T's lien, a potential purchaser (as well as Boone, himself) faces a payoff of at least $148,113.47 plus post-petition interest. In the alternative, Boone presumably would be required to pay, at a minimum, $21,130.92 to cure the delinquent payments and avoid foreclosure.

In short, setting aside the issue of the value of the survivorship interest in the entireties properties, when comparing the values of the properties to be divided according to the proposed settlement, the net value of the Laundromat to be received by Boone is approximately $76,886.53, which is computed by reducing the estimated market value of $225,000.00 by the $148,113.47 owed to BB&T. This amount does not include post-petition interest or fees that are owed to BB&T. On the other side of the equation, the values of the property to be retained for Debtor's bankruptcy estate are approximately $25,000.00 for the unencumbered Residential Lot; approximately $150,000.00 for the Garage Property, less $76,173.72 owed to BB&T (for a net value of $73,826.28); and approximately $21,000.00 for the bank accounts, yielding an aggregate net value of approximately $119,826.28. The result is that the estate will receive

17

$42,939.75 more than Boone if market values of the fee simple properties are used. If the Court were to determine the values by considering the fact that the estate includes only a survivorship interest for the Laundromat and the Residential Lot, the values of those properties would be reduced to nominal amounts because, as the Trustee testified without challenge, the market for survivorship interests is virtually nonexistent except for an internet auction to speculators, at which the estate would be fortunate to recover a combined $2,500.00 for both of the entireties properties.

Based on these findings as to value, and especially considering the fact that BB&T has an absolute right to exercise its rights under state law and foreclose its lien on the Laundromat as soon as Debtor's discharge is granted, the Court finds that the settlement is fair and equitable to Debtor's creditors and is in the best interests of the estate as a whole. The Davises, along with all of Debtor's creditors, will be entitled to a pro rata distribution after sale of the Residential Lot and the Garage Property.

## V.  CONCLUSION

The Court finds that the Trustee has met his burden under Rule 9019. Accordingly, the Trustee's Motion to Compromise will be granted, and the settlement will be approved. An Order consistent with this Memorandum will be entered.

FILED:  November 6, 2018

BY THE COURT

/s/ Suzanne H. Bauknight

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE
